UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**ERIC S.**

    **Plaintiff,**

    **v.**                                                                  Case No. 24-CV-1627

**FRANK BISIGNANO,**
**Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

Eric S. (hereinafter "Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title II application for a period of disability and disability insurance benefits and his Title XVI application for supplemental security income. For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

On August 19, 2021, Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income, alleging disability beginning on June 5, 2018 (Tr. 302), due to a plethora of physical and mental conditions, including trigeminal neuralgia, occipital neuralgia, anxiety, borderline personality disorder, migraines, insomnia, mood swings, and seizures (Tr. 341). Plaintiff's claims were denied initially and upon reconsideration. (Tr. 21.) Plaintiff filed a request for a hearing, and a telephone hearing was held before Administrative Law Judge ("ALJ") William

1

Shenkenberg on February 6, 2024. (Tr. 81–119.) Plaintiff, represented by counsel, testified, as did Thomas Heiman, a vocational expert ("VE"). (*Id.*) During the hearing, Plaintiff amended his alleged disability onset date to February 20, 2021. (Tr. 15, 87.)

In a written decision issued June 14, 2024, ALJ Shenkenberg found that Plaintiff had the severe impairments of trigeminal neuralgia, headaches/migraines, asthma, depression, bipolar disorder, anxiety, a personality disorder, and somatic symptom disorder with pseudo seizures. (Tr. 18–19.) ALJ Shenkenberg determined that Plaintiff had no more than mild or moderate limitations in each of the "paragraph B" criteria found in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 19–20.) ALJ Shenkenberg further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments found in the Listings (Tr. 19.)

ALJ Shenkenberg concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases; must avoid concentrated exposure to hazards such as moving machinery and unprotected heights; would be able to understand, remember and carry out simple instructions, and perform simple routine tasks, in a position having only occasional changes; and would be able to maintain concentration, persistence, and pace for simple tasks in two-hour increments, over the course of a normal workday and work week. (Tr. 21–28.)

The ALJ determined that Plaintiff was unable to perform his past relevant work as a mixing machine operator; however, he concluded that given Plaintiff's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that

Plaintiff could perform. (Tr. 28–30.) As such, ALJ Shenkenberg concluded that Plaintiff was not disabled from February 20, 2021, through the date of the decision, June 14, 2024. (Tr. 30.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. Application to this Case

Plaintiff argues ALJ Shenkenberg made multiple errors in finding him not disabled. First, as to his mental impairments, Plaintiff argues the ALJ did not properly account for his moderate limitations in concentration, persistence, or pace in the RFC assessment. (Pl.'s Br. at 3–9, Docket # 14.) Second, as to his physical impairments, Plaintiff argues the ALJ reversibly erred in assessing Plaintiff's migraines. (*Id.* at 9–13.) And finally, Plaintiff argues the ALJ failed to consider certain factors as required by the regulations in evaluating Plaintiff's subjective symptoms. (*Id.* at 13–18.)

I agree the ALJ erred and remand is required; although not precisely for the reasons Plaintiff contends.

#### 2.1 Medical History of Trigeminal Neuralgia

Despite being a younger individual at the age of 35 years as of his alleged onset date (Tr. 28), Plaintiff has a long history of medical treatment for a myriad of physical and mental impairments. He lists 20 separate conditions limiting his ability to work. (Tr. 341.) However, after reviewing the totality of Plaintiff's records, Plaintiff's most debilitating impairment is arguably trigeminal neuralgia. The trigeminal nerve is a large, three-part nerve (consisting of three branches—ophthalmic, maxillary, and mandibular) located in the head that sends signals from the brain to parts of the face and vice versa. https://my.clevelandclinic.org/health/body/21581-trigeminal-nerve (last visited Jan. 29, 2026). The trigeminal nerve provides sensation to large parts of the face and allows one to chew food. *Id.* Trigeminal neuralgia is a chronic pain disorder that causes episodes of intense facial pain, typically when a blood vessel puts pressure on the trigeminal nerve. *Id.* For those with this condition, even "light touch from brushing your teeth or putting on makeup may

4

trigger a jolt of pain." https://www.mayoclinic.org/diseases-conditions/trigeminal-neuralgia/symptoms causes/syc-20353344 (last visited Jan. 29, 2026).

In October 2019, Plaintiff was referred by his treating neurologist Dr. Shawn Whitton to neurosurgeon Dr. Richard Harrison for right-sided facial pain that was sharp and stabbing in nature. (Tr. 1270.) Plaintiff reported that the pain had been present for three years but was gradually worsening. (*Id.*) He stated that his symptoms increased with shaving, cold air, and applying pressure. (*Id.*) Upon physical examination, Dr. Harrison noted that Plaintiff was hypersensitive to touch at the maxillary and ophthalmic branches of the trigeminal nerve on the right side of his face, with the maxillary being more severe. (Tr. 1274.) He also noted that imaging showed vascular compression of the trigeminal nerve root. (Tr. 1274–75.) Thus, Dr. Harrison agreed that Plaintiff had trigeminal neuralgia on the right secondary to vascular compression. (Tr. 1275.) Dr. Harrison recommended Plaintiff undergo a right suboccipital craniectomy for decompression of the fifth cranial nerve. (Tr. 1275, 1252.) This surgical procedure consists of moving the artery or vein away from the nerve to alleviate pressure on the nerve. https://my.clevelandclinic.org/health/procedures/microvascular-decompression (last visited Jan. 29, 2026). Plaintiff agreed to undergo this procedure, wishing to proceed "as soon as possible." (Tr. 1275.) Dr. Harrison performed the surgery on December 4, 2019. (Tr. 1250.)

Plaintiff reported that the surgery provided "excellent" pain relief for approximately six months. (Tr. 2411.) However, the records show Plaintiff's pain returned. In early March 2020, Plaintiff presented to the emergency room with worsening facial pain that caused him to pass out. (Tr. 1213.) He contacted Dr. Whitton and requested a visit to discuss "new issues from trigeminal surgery." (*Id.*) During a visit on March 26, 2020, Plaintiff stated that the right

5

side of his face was very sensitive to cold and touch. (Tr. 2022.) Dr. Whitton continued Plaintiff on his medication regimen of gabapentin and baclofen and increased his dosage of Trileptal (oxcarbazepine). (Tr. 2023.) Dr. Whitton stated that if Plaintiff continued to have a significant amount of pain, he would "maximize Trileptal 1200 mg b.i.d." (*Id.*)

In June 2020, Dr. Whitton noted that Plaintiff continued to have significant right-sided facial pain and had been unable to tolerate higher doses of his medication due to side effects. (Tr. 2006.) They discussed the possibilities of either radiosurgery or referral to UW-Health. (*Id.*) That same month, Plaintiff met with Dr. David Rohde regarding the role of radiosurgery in treating trigeminal neuralgia. (Tr. 1192.) Dr. Rohde explained that radiosurgery typically shows a 70-75 percent improvement rate in pain. (*Id.*) Plaintiff expressed interest in the procedure but wanted to discuss it with his wife. (*Id.*) He was to notify the office by the end of the week whether he wished to pursue this option. (Tr. 1193.) There is no indication in the record, however, that Plaintiff pursued radiosurgery at that time.

Instead, Plaintiff requested a referral to UW-Health and attended a consultation with neurologist Dr. Audrey Jantzen in October 2020. (Tr. 4739.) Plaintiff reported experiencing up to 30 flares of right-sided facial pain daily that lasted up to 20 minutes at a time. (*Id.*) Wind, light, heat, and cold made the pain worse. (*Id.*) Plaintiff stated that he was "lucky if he [could] go 5 hours without pain" and when the pain was really bad, Plaintiff stated that his wife needed to stop him from pulling his ear off. (*Id.*) Dr. Jantzen noted that Plaintiff currently took gabapentin and baclofen, both of which helped initially but had to be decreased due to side effects. (Tr. 4742.) Plaintiff started on oxcarbazepine but that also had to be decreased due to side effects. (Tr. 4742–43.) Dr. Jantzen noted that Plaintiff continued to have significant pain despite undergoing extensive treatment. (Tr. 4743.) She referred him to

6

advanced pain management and physical therapy for pain control, as well as noted that he was aware radiation treatment was another possible option. (*Id.*)

Plaintiff returned to Dr. Whitton in December 2020 and continued to report facial flare-ups of pain. (Tr. 1982.) Dr. Whitton concluded that there was not much more that he could offer Plaintiff in terms of treatment. (Tr. 1984.)

Plaintiff attended a new patient consultation with Dr. Jeremy Scarlett for his trigeminal neuralgia on January 11, 2021. (Tr. 2411.) Plaintiff reported that his pain became worse with brushing his teeth, use of heat or ice, chewing, and shaving his face. (*Id.*) Upon physical examination, Dr. Scarlett noted Plaintiff had an abnormally increased sensitivity in the maxillary nerve region ("hyperesthesia right V2 distribution"). (*Id.*) Because Plaintiff's current regimen of medication could not be increased due to side effects, Dr. Scarlett started him on buprenorphine (*id.*), a medication used to "relieve pain severe enough to require daily, around-the-clock, long-term opioid treatment and when other pain medicines did not work well enough or cannot be tolerated." https://www.mayoclinic.org/drugs-supplements/buprenorphine-buccal-mucosa-route-sublingual-route/description/drg-20074237 (last visited Jan. 29, 2026). He noted however, that overall, Plaintiff's condition was stable. (Tr. 2410.)

By February, Plaintiff discontinued the buprenorphine due to having an allergic reaction and was stated on tapentadol (Tr. 2406), an opioid pain medication used to treat moderate to severe pain, https://www.drugs.com/nucynta.html (last visited Jan. 29, 2026). Plaintiff stated that the tapentadol helped "some" but that the pain remained "excruciating." (Tr. 2406.) Upon physical examination, Christa Scheunemann, NP also noted Plaintiff had an abnormally increased sensitivity in the maxillary nerve region. (Tr. 2408.) NP

Scheunemann noted that Plaintiff planned to receive a trigeminal nerve block; however, he was requesting monitored anesthesia care ("MAC") sedation, which was currently unavailable. (Tr. 2403.) The MAC sedation remained unavailable throughout 2021. (Tr. 2396, 401.) In the interim, Plaintiff continued to experience severe facial flares. (Tr. 1132.)

In October 2021, Dr. Jantzen referred Plaintiff to Dr. Jonathan Takahashi at UW-Health for consultation on his trigeminal neuralgia. (Tr. 4693.) Plaintiff experienced what he and his wife referred to as a "mild episode" of trigeminal neuralgia pain during the appointment, and Dr. Takahashi noted that Plaintiff had to pause, his face began to contort, and he was in visibly significant discomfort, unable to talk. (Tr. 4694.) Plaintiff's wife helped comfort him through the episode, which lasted about five minutes. (*Id.*)

Plaintiff began treating with Kamali Esmaeil, APNP, at a neurology clinic in late December 2021 for his trigeminal neuralgia. (Tr. 2338.) At this time, NP Esmaeil noted that Plaintiff was most concerned about "periodic difficulty with right-sided facial pain" that intensified when brushing his teeth, chewing, shaving, and touching his face. (Tr. 2339.) NP Esmaeil noted that Plaintiff tried multiple medications, "and even decompression surgery," without "significant effectiveness." (Tr. 2341.) He told Plaintiff he "[did] not have anything else to offer him except to continue with medication or a referral to pain management for further evaluation and possibly [a] trigeminal nerve block which he would like to pursue." (*Id.*) NP Esmaeil described Plaintiff's symptoms as "fairly well under control" with his current treatments, including baclofen, gabapentin, and oxcarbazepine. (*Id.*) NP Kamali sent Plaintiff for consultation with Nicole Hansen, APNP, regarding a trigeminal nerve block. (Tr. 2321.)

Plaintiff still, however, was unable to undergo a trigeminal nerve block, this time because of abscesses in his teeth. (Tr. 2291.) Plaintiff was told he could not get the nerve block

8

until his dental issues were resolved. (*Id.*) Plaintiff reported, however, that he needed MAC sedation for the dental procedure to prevent triggering a facial flare from holding his mouth open and he was having difficulty finding a provider to perform the procedure. (Tr. 2291–92.) Plaintiff's wife stated Plaintiff's pain was "becoming worse and worse" and she had to hold Plaintiff's arms down to keep him from ripping his face off due to the severe pain. (*Id.*) By February 2022, NP Kamali described Plaintiff's trigeminal neuralgia as "not ideally well controlled with multiple medications." (Tr. 2290.)

In March 2022, NP Kamali noted that Plaintiff continued to experience right-sided flareups, but that the trigeminal neuralgia nerve block remained "on hold" until his dental work could be performed. (Tr. 2243.) Plaintiff reported daily episodes of jolting pain, sometimes between nine and 11 times a day, lasting for a short duration. (*Id.*) He further reported daily dull, aching pain with several episodes of severe facial pain that intensified with prolonged talking, chewing, cold, and breeze. (*Id.*)

In late March 2022, NP Hansen referred Plaintiff back to his original surgeon, Dr. Harrison, for evaluation. (Tr. 1935.) At this appointment, Plaintiff reported having bilateral facial pain that day, which Dr. Harrison's physician's assistant, Mikayla Meyer, told him was inconsistent with a diagnosis of trigeminal neuralgia. (Tr. 1940.) He was told that surgery would not be appropriate at that time. (*Id.*) In a follow-up communication in May 2022, Dr. Harrison reviewed an MRI of Plaintiff's brain which showed arterial crowding of the bilateral trigeminal nerves. (Tr. 1934.) He reiterated that because Plaintiff's first surgery was unsuccessful, a second surgery would likely also be unsuccessful and posed a risk of stroke or death. (*Id.*) Dr. Harrison offered to send Plaintiff for a consultation regarding stereotactic radiosurgery; however, Plaintiff again stated he needed to discuss this with his wife and would

9

call if he was interested. (*Id.*) Once again, it does not appear Plaintiff followed-up regarding radiosurgery at that time.

For the remainder of 2022, Plaintiff received Botox injections for his migraine headaches, as well as injections to treat cervicogenic migraines. (Tr. 2219, 2230, 2485, 2493, 2718, 2729.) In August 2022, he told his treating therapist that he was trying to cope with his facial flares on his own, including by limiting his exposure to hot weather. (Tr. 2483.)

Plaintiff again treated with NP Kamali for his trigeminal neuralgia in April 2023. (Tr. 3875.) He reported that he continued to have increasing pain in the right side of his face and had "learned to redirect the pain from his face to his arms." (*Id.*) Plaintiff further reported that his chewing was impaired and he was still waiting for dental surgery. (*Id.*) He noted that the combination of Trileptal, Neurontin, Toradol, and baclofen were effective to alleviate some of his "facial pain headaches." (*Id.*) After noting Plaintiff continued to have problems with right-sided facial pain due to trigeminal neuralgia, NP Kamali expressed hope that his dental surgery would help improve his symptoms. (Tr. 3876.)

The oral surgery was performed in June 2023 in which all of Plaintiff's remaining teeth were extracted. (Tr. 2863.) Plaintiff experienced a severe facial flare after the surgery where he reported blacking out. (Tr. 2953.) In February 2024, Plaintiff testified he experienced trigeminal neuralgia flares anywhere from 15 to 25 times a day, ranging in severity. (Tr. 94.) He stated that during a minor flare, he could work through it by scratching himself. (*Id.*) During a moderate flare, he needs another's assistance to "move the pressure points" to counteract the direction of the flare. (*Id.*) And during severe flares, Plaintiff testified he has tried to rip his ears, nose, and lips off; has yanked his hair from his head; and slammed his head into a wall in an attempt to redirect the pain. (*Id.*) Plaintiff further described going into

10

a "blackout" during a severe flare where his mind "goes into like a passive moment" and he does not know what is going on. (Tr. 95.)

### 2.2 Accommodation of Trigeminal Neuralgia in RFC

While Plaintiff argues the ALJ failed to consider the combined impact of his mental impairments, migraines, and trigeminal neuralgia when assessing his limitations in concentration, persistence, or pace in the RFC (Pl.'s Br. at 8–9), it is the ALJ's general assessment of the limitations caused by Plaintiff's facial flares that is flawed. The RFC is an assessment of what work-related activities the claimant can perform despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1).[1]

ALJ Shenkenberg agrees Plaintiff's trigeminal neuralgia is a severe impairment; however, he concludes that the evidence supports that his symptoms can be accounted for with the stated RFC. (Tr. 26.) I disagree. The ALJ fails to provide a logical bridge between the evidence and this conclusion. Specifically, it is entirely unclear what portion of the RFC accounts for the limitations caused by the trigeminal neuralgia. While the ALJ states that Plaintiff's trigeminal neuralgia supports that he avoid concentrated exposure to hazards such as moving machinery and unprotected heights (Tr. 27), the ALJ is crediting the opinions of the two State Agency physicians who are addressing his migraines and pseudo-seizures (160,

---

[1] As the regulations governing the evaluation of disability for disability insurance benefits and SSI are nearly identical, I will generally refer to the regulations for disability insurance benefits found at 20 C.F.R. § 404.1520, *et seq.* for ease of reference.

193). While these limitations are likely also warranted because of Plaintiff's trigeminal neuralgia, it is unclear how the RFC otherwise accommodates the symptoms this condition causes. Specifically, the occurrence of daily "facial flares" causing periods of pain and the inability to function.

As an initial matter, it is unclear which symptoms of trigeminal neuralgia the ALJ finds inconsistent with Plaintiff's allegations of disabling symptoms. ALJ Shenkenberg notes that Plaintiff's "reports vary" regarding the frequency of his episodes of facial flares. (Tr. 23.) For example, in October 2020, Plaintiff reported experiencing approximately 10 facial flares per day, however, the flares had recently increased to up to 30 per day. (Tr. 4739.) The ALJ cites Plaintiff's fall 2021 report of experiencing two to three episodes of facial pain per day and Plaintiff's February 2024 testimony that he experienced 15 to 25 flares of facial pain per day. (Tr. 23, 26.) Although it is unclear how many facial flares the ALJ believes Plaintiff experiences per day, it appears he credits that Plaintiff experiences at least *some* amount of daily facial flares.

The evidence also indicates that Plaintiff's facial flares can last for varying amounts of time. In October 2020, Plaintiff told Dr. Jantzen that the pain can last for up to 20 minutes. (Tr. 4739.) In August 2021, Plaintiff reported that his facial flares typically last anywhere from one to 10 minutes but that he experienced a flare that day again lasting 20 minutes. (Tr. 1133.) In October 2021, Dr. Takahashi witnessed a "mild" flare during the appointment that lasted five minutes. (Tr. 4694.) And the ALJ cited to a medical record where Plaintiff experienced a facial flare during neuropsychological testing in September 2021 that lasted "a few moments." (Tr. 26, 1467–68.)

The evidence also describes how Plaintiff reacts during a facial flare. As the ALJ cited, during the brief episode in September 2021, Plaintiff became unresponsive. (*Id.*) During the flare witnessed by Dr. Takahashi, he described Plaintiff's face contorting and becoming unable to talk, in visibly significant discomfort. (Tr. 4694.) During a flare in August 2021, Plaintiff's hearing became fuzzy, he became increasingly dizzier, was pale, and needed a wheelchair due to increasing unsteadiness on his feet. (Tr. 1133.)

The evidence also describes how Plaintiff works through these flares. He testified that during a minor flare, he can work through it by scratching himself. (Tr. 94.) Dr. Takahashi observed that Plaintiff worked through the "minor" flare by receiving soothing words and an embrace from his wife. (Tr. 4694.) During moderate, longer flares, Plaintiff's wife stated she needed to redirect him. (Tr. 1133.) Plaintiff similarly testified that he needed another's assistance to "move the pressure points" to counteract the direction of the flare. (Tr. 94.) However, during the most severe episodes, the record indicates Plaintiff required his wife's assistance to hold him down so he did not injure himself. (Tr. 94, 2280.) ALJ Shenkenberg notes that distraction and breathing are helpful during minor pain episodes, and that Plaintiff has less frequent and less severe pain when around supportive people such as his cousins. (Tr. 23.)

But to the extent ALJ Shenkenberg credits the evidence that Plaintiff experiences daily facial flares varying in duration and severity and that during these flares Plaintiff is at best distracted and at worst unresponsive, it is unclear how the RFC accommodates these symptoms. Perhaps, then, the ALJ is *not* crediting that Plaintiff experiences daily facial flares of varying duration and severity. Once again, the decision is unclear.

Although it is unclear which trigeminal neuralgia symptoms ALJ Shenkenberg credits, he does conclude that Plaintiff's condition is not as severe as Plaintiff alleges. His reasons, however, do not support his conclusion. For example, the ALJ cites to a record from March 2022 when Plaintiff attended a neurological surgery consultation with physician's assistant Mikayla Meyer, who worked in conjunction with Dr. Harrison, the surgeon who performed Plaintiff's December 2019 decompression surgery. (Tr. 23, Tr. 702–03.) On that day, Plaintiff was having bilateral facial pain. (Tr. 702.) PA Meyer told him that bilateral facial pain was inconsistent with a diagnosis of trigeminal neuralgia, or at least very atypical. (*Id.*) Dr. Harrison did not recommend further surgery. (Tr. 1934.) While the ALJ cites both facts, it is unclear his purpose in doing so. (Tr. 23.)

To the extent the ALJ found PA Meyer was questioning Plaintiff's diagnosis of trigeminal neuralgia because he was experiencing bilateral facial pain that day, this is inaccurate. Imaging from that time indicated that a "number of blood vessels [were] seen in close proximity as well as possibly contacting the cisternal portion of the bilateral trigeminal nerves" and the "appearance [was] similar to what was seen back in 2019." (Tr. 2161.) The "indication" was listed as trigeminal neuralgia. (Tr. 2162.) In other words, neither PA Meyer nor any other provider ever concluded that Plaintiff was misdiagnosed with trigeminal neuralgia. And while Dr. Harrison did not recommend Plaintiff undergo a second surgery for his facial pain, this was because his first surgery was unsuccessful and the risks involved with a second surgery (including stroke or death) were too great for a surgery that would likely also be unsuccessful. (Tr. 1934.)

ALJ Shenkenberg also cites the record evidence that Plaintiff used marijuana, which took the edge off of his pain. (Tr. 23.) While Plaintiff did state that THC was the only thing

that helped his pain (Tr. 2400), he was told by his treating provider that they could not prescribe Plaintiff opiates if he continued to test positive for THC (Tr. 2403). Furthermore, Wisconsin does not provide access to medically prescribed THC; thus, he could not legally pursue that avenue of treatment. In other words, Plaintiff's use of THC cannot discount his allegations of disabling pain.

In discounting Plaintiff's symptoms, the ALJ also finds that Plaintiff's neurology examinations are typically normal, that medication alleviates some of his facial pain, and that his trigeminal neuralgia is "stable" with a medication regiment. (Tr. 23.) As to Plaintiff's neurological examinations, ALJ Shenkenberg points to various testing that does not address his right-sided facial pain, such as normal coordination; stability; gait; sensation, muscle tone, and deep tendon reflexes in the extremities; and cervical spine range of motion. (*Id.*) But when Plaintiff's providers examined his face, the records reflected hypersensitivity of the maxillary nerve region on the right. (Tr. 2408, 2411.) This hypersensitivity symptom is consistent with the fact that despite the relevant period occurring during the coronavirus pandemic, Plaintiff was excused from wearing a mask to his medical appointments due to the pain it caused his face. (Tr. 2250, stating that Plaintiff "is unable to wear a mask because that activates his trigeminal neuralgia.")

As to medications controlling Plaintiff's condition, the ALJ notes that certain medications, including Trileptal, Neurontin, Toradol, and baclofen, are effective in alleviating "some" of Plaintiff's facial pain and that Tramadol was "quite helpful in the past." (Tr. 23.) The ALJ fails to recognize, however, that these medications caused Plaintiff severe side effects making it difficult to increase the dosages. (Tr. 4693.) For example, Plaintiff reported to Dr. Jantzen that baclofen "made him feel high" and Trileptal (oxcarbazepine)

15

"made him feel drunk" when the dosages were increased. (Tr. 4739–40.) And while the combination of these drugs alleviated *some* of his facial pain, he continued to report severe facial flares despite taking the medications. (Tr. 2953.)

And as to the "stability" of Plaintiff's condition, "[s]imply because one is characterized as 'stable' or 'improving' does not necessarily mean that [he] is capable of doing light work." *See Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), *as amended* (Aug. 20, 2014). Even when Plaintiff's condition is static, he continues to experience multiple daily facial flares.

The ALJ also noted that distraction and breathing were helpful during mild pain episodes, that Plaintiff has less frequent and less severe pain when around supportive people, and had less pain when his cousins visit or when helping a friend. (Tr. 23.) It is entirely unclear, however, how these conditions could be replicated in a work environment. ALJ Shenkenberg noted that Plaintiff's neurologist was "hopeful" that his facial pain would improve after receiving dental treatment (Tr. 24), but Plaintiff continued to report severe facial flares after the dental surgery (Tr. 2953).

Furthermore, ALJ Shenkenberg appears to credit Plaintiff's statements that cold air on his face triggers facial flares. (Tr. 23.) In fact, the record supports that temperature extremes, both hot and cold, worsen his pain. (Tr. 2403–04, 3623, 4739.) When medical intervention failed to lessen his facial flares, Plaintiff reported to his treating therapist that one of the ways he was "trying to cope with his facial flares . . . on his own," was by limiting his exposure to hot weather. (Tr. 2483.) Despite evidence supporting this common trigger of a facial flare, the ALJ provides no further environmental limitations such as avoiding temperature extremes to prevent triggering a flare.

The ALJ also rejected the assessment of Plaintiff's treating physician, Dr. Michael Hoffman, who stated in August 2023 that Plaintiff was unable to sustain any meaningful employment due to the unpredictability and severity of his facial flares. (Tr. 4748.) Dr. Hoffman stated that Plaintiff experienced "altered levels of consciousness during these flares." (Tr. 4747.) ALJ Shenkenberg rejected Dr. Hoffman's statements, finding that they did not set forth clear work limitations, are conclusory, and do not constitute medical opinions. (Tr. 26.) While Dr. Hoffman does not provide specific work restrictions, his description of Plaintiff's inability to function during a facial flare is consistent with the record as a whole.

The ALJ further found that Dr. Hoffman's treatment notes in 2023 noted Plaintiff had rotting teeth, but otherwise stated his conditions were stable. (Tr. 27.) While the ALJ points to Dr. Hoffman's progress notes from 2023, Plaintiff treated with Dr. Hoffman for years prior. And these records support Dr. Hoffman's observation and treatment of facial flares over the relevant time frame. For example, in March 2021, Dr. Hoffman treated Plaintiff for dizziness. (Tr. 1576.) During the appointment, Plaintiff reported an episode of blurred vision and Dr. Hoffman noted that Plaintiff "did seem to lose focus and blink his eyes often during that time." (Tr. 1578.) In May 2021, Dr. Hoffman treated Plaintiff for facial pain and swelling and noted that Plaintiff had trigeminal neuralgia that was worsened by abscesses in his teeth. (Tr. 1547.) Upon physical examination, Dr. Hoffman noted that Plaintiff appeared to be in mild distress. (Tr. 1549.) And in February 2022, Dr. Hoffman reported that he observed Plaintiff sitting with his head down, crying, with his wife hugging him, stating he was "in so much pain." (Tr. 2284.)

In short, I cannot follow the ALJ's reasoning for discrediting Plaintiff's statements regarding disabling symptoms due to trigeminal neuralgia and how he accommodated the

17

symptoms he did credit in the RFC. Thus, the case will be remanded for the ALJ to reassess Plaintiff's RFC. Although Plaintiff raises several arguments regarding accommodation of his mental health impairments and migraines in the RFC and evaluation of his subjective symptoms, because this case is being remanded, I will not address those arguments.

## CONCLUSION

Plaintiff argues the ALJ's decision finding him not disabled is contrary to the substantial evidence in the record. I agree that remand is warranted to address the ALJ's evaluation of Plaintiff's trigeminal neuralgia in his RFC. Thus, this case is remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 29th day of January, 2026.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge